UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA                                                                                                    PLAINTIFF

v.                                                                                              CRIMINAL ACTION NO. 3:12-CR-2-H

SHOMARI BEVERLY                                                                                                            DEFENDANT

**FINDINGS OF FACT
CONCLUSIONS OF LAW
AND RECOMMENDATION**

**INTRODUCTION**

This matter is before the Magistrate Judge on the motion of the Defendant, Shomari Beverly, who seeks to suppress evidence obtained as the result of his warrantless stop by Louisville police on December 2, 2011. On that date, narcotics detective Daran Hodges stopped Beverly at the entrance to the Springhill Suites Hotel to inquire about a suspicious package Beverly was carrying. After Beverly declined to produce identification, or to give his name, Det. Hodges allegedly obtained consent for a pat-down search. The pat-down led Hodges to discover in the right rear pocket of Beverly's pants a California driver's license bearing Beverly's picture and the name "Curtis Wright."

When Det. Hodges ran the driver's license number through the National Crime Information Center (NCIC), he learned that the license had been issued to a female driver located at another address in California. Hodges arrested Beverly for possession of the false license. He then obtained two search warrants, one for the package and another for Beverly's hotel room. Execution of the warrant issued on the package produced 128 counterfeit bank cards bearing the name "Shawn Gardner." A separate search of Beverly's personal possessions pursuant to the other warrant produced a Nevada driver's license bearing Defendant Beverly's image with the

name "Shawn Gardner" on it.

As a result of these events, a federal grand jury seated in Louisville, Kentucky returned an indictment against Beverly charging him with one count of possession of 15 or more unauthorized access devices in violation of 18 U.S.C. §§1029(a)(3) and 1029(c)(1)(A) and( C ). Beverly now argues in his motion to suppress that Det. Hodges lacked an objectively reasonable suspicion to make an investigative stop of him as he entered the hotel. Beverly also maintains that he did not give a valid consent for Det. Hodges to conduct a pat-down search. Based on the testimony of Det. Hodges, the Magistrate Judge concludes that the detective conducted a lawful *Terry* stop of Beverly in light of the totality of the information then available to him. The Magistrate Judge further concludes that Beverly gave a knowing and voluntary consent for the detective to conduct the pat-down search that led to Beverly's arrest and the issuance of the search warrants.[1]

### FINDINGS OF FACT

Det. Daran Hodges, an 18-year veteran of the Louisville Metro Police Department (LMPD), was the sole witness to testify at the suppression hearing held on the Defendant's motion.[2] (DN 57, Tr. Of Supp. Hearing (TH) at p. 4). Det. Hodges testified that the bulk of his police career has involved the investigation of narcotics-related crimes. Consequently, his professional experience includes training in the detection, identification and interdiction of illegal drugs. (TH, p. 5-6).

---

[1] Beverly does not raise a constitutional challenge to the issuance of the search warrants.

[2] The hearing was stenographically recorded by court reporter Dena Legg. (DN 57).

On the morning of Dec. 2, 2011, at approximately 8:45 a.m., Det. Hodges received information from an confidential informant (CI) concerning a suspicious package. (TH p. 7). The informant had worked with Hodges since 2007 and had provided him with reliable information about drug and other offenses on multiple occasions during that time.[3] On this occasion the informant advised Hodges merely that a suspicious package would be arriving at Kinko's that morning. Otherwise, the informant gave Hodges no specific facts. (DN 57, TH, p. 35-36, 46-49).

Det. Hodges on receiving this information drove to the Kinko's at 315 W. Market to conduct an investigation. (TH, p. 8). He personally examined the outside of the suspect package and immediately noticed several suspicious features. (TH, p. 8, U.S. exh. 1 packing label). First, the package contained a handwritten label, contrary to the business practices of most companies that use typewritten mailing labels. (TH, p. 8-9). Second, the package had been paid for in cash, rather than a business account being billed for the shipment. (Id.). Third, the shipper's address and identification proved to be false. (Id.).

The shipping label listed the shipper as "D.I.S." at a specific address in Sacramento, California, a known drug source city according to Det. Hodges. When Hodges checked the listed shipper's address using his smart phone to make a Google search, the address proved to be fictitious. Further, the phone number for the shipper was not in operation. (Id at p.

---

[3] According to the criminal complaint affidavit of U.S. Secret Service Special Agent Clayton Middleton, Det. Hodges advised Agent Middleton following Beverly's arrest that the CI had told Hodges that a FedEx package addressed to Curtis Wright and believed to contain narcotics would be arriving from Sacramento at the Kinko's FedEx office at 315 W. Market Street in Louisville, Kentucky. (DN 1, affidavit Agent Clayton Middleton at p. 1, ¶ 3(a)). Det. Hodges in his hearing testimony, however, indicated only that the CI had advised him that the FedEx package was "suspicious." (DN 57, TH p. 7).

3

9, 38). All of these circumstances caused the detective to believe that the package likely contained illegal drugs. Hodges, however, did not seize the package. Instead, he left it at the Kinko's to await the arrival of the recipient and immediately set up surveillance. (Id.).

From his parked truck, located approximately 40-50 yards from the store, Det. Hodges watched as a Chevy Malibu with Connecticut license plates pulled up outside the Kinko's at approximately 10:30 a.m. that morning. (TH, p. 10-11). A black male got out of the vehicle and entered the store. (TH, p. 11). While the driver was inside, Det. Hodges ran the license plate number on the Malibu, which turned out to be a rental car. (Id.).

Soon thereafter the same individual emerged from the Kinko's carrying the package that Det. Hodges had just examined earlier that same morning. (Id.). The suspect entered the Malibu and began to drive east on W. Market Street turning south onto First Street without giving a turn signal. (Id.)(U.S. exh. 2, route map). As Det. Hodges followed along behind, he watched the Malibu turn west onto Liberty Street, again without signaling for the turn. Det. Hodges called for police backup as the Malibu turned north onto Brook Street. (TH, p. 13-15).

Hodges then briefly lost sight of the Malibu, but as he looked left down Jefferson Street, he saw that the same automobile pulling into the parking garage next to the Springhill Suites Hotel. (TH, p. 12). The Malibu entered the hotel parking garage by driving through the garage exit. (Id.). Det. Hodges drove immediately to the parking lot of the hotel and watched as Defendant Beverly exited the Malibu. Beverly walked toward the hotel entryway carrying the FedEx package that the detective had examined. (TH, p. 16). Hodges saw no one else in the Malibu automobile throughout this entire series of events. (TH, p. 14).

4

When Defendant Beverly entered the small breezeway, or corridor, that connected the Springhill Suites with an adjacent hotel, Det. Hodges approached him. (TH, p. 16). Hodges was wearing plain clothes. His police badge was displayed from a necklace he was wearing. (TH, p. 22). He did not have his sidearm drawn. (Id.). Hodges identified himself as a police officer. (Id.). He told Beverly that he was investigating the suspicious package that Beverly had in his possession. (Id.). As the two stood in the 10x20 foot breezeway near the entry door to the hotel, Det. Hodges asked Beverly if he had any identification. (TH, p. 16, 22, 40-41.). Beverly told the detective that he had no identification. The detective then asked Beverly to give his name. Beverly instead merely stood silent. (Id.).

Detective Hodges testified that he next asked Beverly if Beverly would agree to a pat-down search for weapons and identification. (TH, p. 17, 42-43, 49-50). According to the detective, Beverly responded that he had no objection to the pat-down search. (Id. at 49-50). In Beverly's right, rear pants pocket Det. Hodges felt a plastic card. He removed the card and examined it. It was a California driver's license. The license bore Beverly's picture, along with the name "Curtis Wright" and the address 235 Glen Avenue, San Leandro, California. (Id.)(U.S. exh. 4, CA driver's lic'n).

While another officer who had arrived on the scene kept watch on Beverly, who was then seated in the hotel foyer, a common area near the check-in desk, Det. Hodges stepped outside into the parking lot to conduct an NCIC check on the California driver's license. (TH, p. 19-20, 43-44). The NCIC license check revealed that the California driver's license actually belonged to a female driver located in another California city. (TH, p. 18). Beverly accordingly was in criminal possession of a forged instrument. Det. Hodges returned to the lobby and

5

immediately placed Beverly under arrest . (Id.). During this entire series of events, the FedEx package remained located unopened on a luggage cart nearby, where Det. Hodges had placed it immediately prior to the pat-down search. (TH, p. 19, 21).

Hodges and the other officers at the scene arranged for the hotel staff to provide an office in which Beverly could wait while they investigated the possibility that Beverly had two accomplices assisting him. (TH, p. 25, 45-46). After investigation at the hotel ruled out that possibility, Det. Hodges transported Beverly to his police office on Barrett Avenue. (TH, p. 21). Once there, Det. Hodges drafted a search warrant for the FedEx package and a second search warrant application for Beverly's hotel room. (Id.). Execution of the search warrant issued for the package revealed that it contained 128 counterfeit bank credit cards bearing the name "Shawn Gardner." (TH, p. 24). Execution of the search warrant issued for the hotel room revealed a wallet containing a fake Nevada driver's license bearing the Defendant's image and the name "Shawn Gardner."[4] (TH, p. 25-26)(U.S. exh. 4, NV Driver's Lic'n).[5]

Throughout these events, Det. Hodges spoke in a conversational tone to Beverly. (TH, p. 22). He made no threats. He did not use force nor insist that Beverly consent to a pat-down search. (TH, p. 23). According to the detective, Beverly also remained calm and collected throughout the entire encounter, which took all of three minutes from the time that Det. Hodges initially approached Beverly until the pat-down search resulted in the discovery of the fake California driver's license and Beverly's arrest. (TH, p. 20, 23). A subsequent NCIC criminal

---

[4] Prior to the execution of the second search warrant, hotel staff removed the Defendant's personal property from his hotel room and placed it in the lost and found area at the hotel where the detectives executed the search warrant on the Defendant's personal property.

[5] Defendant does not challenge the legality of either search warrant.

records check for Beverly revealed his prior arrest in California on March 7, 2009 for driving under the influence and for carrying a loaded firearm. (TH, p. 27).

## CONCLUSIONS OF LAW

**The *Terry* Stop.**

The first question to be addressed involves Det. Hodges' warrantless stop of Defendant Beverly at the breeze way immediately outside the Springhill Suites Hotel. Under *Terry v. Ohio*, 392 U.S. 1, 9 (1968), a warrantless stop for questioning will be held to be reasonable if "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *See United States v. Vite-Espinoza*, 342 F.3d 462, 466-67 (6th Cir. 2003) (quoting *Terry*, 392 U.S. at 21-22)).

The standard for reasonable suspicion under *Terry* is an objective one. *Id*. It requires that the detaining officers "'have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Johnson*, 620 F.3d 685, 692 (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). In determining whether such reasonable suspicion exists, the reviewing court is to look to the totality of the circumstances in place at the time of the seizure. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. McCauley*, 584 F.3d 440, 443 (6th Cir. 2008). No fact is to be analyzed in isolation. *United States v. Williams*, 615 F.3d 567, 666 (6th Cir. 2010); *United States v. Martin*, 289 F.3d 392, 397 (6th Cir. 2002) ("[C]ourts do not separately scrutinize each factor relied on by the officer conducting the search.") Consequently, a series of acts that independently may appear innocent, when taken together, can justify further investigation. *Arvizu*, 534 U.S. at 274.

7

Officers in conducting such an investigation are entitled to rely upon their professional experience and specialized training to draw inferences from and make deductions about the cumulative information available to them, information that might well seem entirely innocuous to the untrained eye. *United States v. Perez*, 440 F.3d 363, 371 (6th Cir. 2006). Among the facts that an officer may fully consider in the totality of the circumstances are the officers' own direct observations, information received from police dispatch, directions or information from other police officers involved in the investigation, as well as the area and time of day during which the suspicious activities occurred. *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008); *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008).

What is important in this regard is the collective information available to the officers at the time of the warrantless stop itself. *United States v. Torres-Ramos*, 536 F.3d 542, 552 (6th Cir. 2008), *cert. denied*, *Rahburn v. United States*, 129 S.Ct. 772 (2008); *Feathers v. Aey*, 319 F.3d 843, 848-49 (6th Cir. 2003) (totality of the circumstances involves consideration of "all of the information available to law enforcement officials at the time"). The Court in considering this totality of the circumstances will review the evidence offered in support of reasonable suspicion "using a commonsense approach as understood by those in the field of law enforcement." *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004) (citing *Cortez*, 449 U.S. at 417-18). Also included within this totality of the circumstances is information provided by a previously reliable informant. *Id.*

The Government bears the burden to prove by a preponderance of the evidence the existence of a reasonable suspicion to believe, based on objective and articulable facts, that the Defendant was engaged in criminal activity at the time of the warrantless investigative stop.

*Torez-Ramos*, 536 F.3d at 552. Certainty of criminal activity need not be shown in order for a suspicion to be objectively reasonable under the Fourth Amendment. *United States v. Flores*, 571 F.3d 541, 545 (6th Cir. 2009) ("but law enforcement officers need not have certainty in order for a suspicion to be reasonable"). In fact, the level of suspicion necessary for a warrantless investigative stop is relatively minimal and "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). While an inchoate or unparticularized suspicion or hunch will not suffice, so long as articulable facts reasonably suggest that criminal activity "may be afoot," even though the officers involved lack probable cause for the challenged investigatory stop, such stop will be constitutionally reasonably under *Terry*. *Id.*

The analytical framework of *Terry* requires that courts also address a related question about the degree of intrusion once a suspect has been lawfully stopped. *See, United States v. Campbell*, 549 F.3d 364, 370-72 (6th Cir. 2008). In other words, a lawful *Terry* stop must not only be justified at the point of its inception, but additionally must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* (citing *Blair*, 524 F.3d at 750). The investigative detention must last no longer nor be more intrusive than is necessary to carry out the purpose of the stop, otherwise a temporary investigative stop will become an arrest that must be supported by probable cause. *Dorsey*, 517 F.3d at 398; *United States v. Garcia*, 496 F.3d 495, 504 (6th Cir. 2007). *See also, Torres-Ramos*, 536 F.3d at 551-52 ("If the detention is proper, then the second question is 'whether the degree of intrusion ... was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officers' conduct given their suspicions and surrounding

circumstances.") (citing *United States v. Caruthers*, 458 F.3d at 464).

Safety concerns are an integral factor in *Terry* stop situations. *Campbell*, 549 F.3d at 371-72. For example, a legitimate concern for officer safety will permit the police to order the driver and passenger out of a stopped vehicle. *Id*. When a reasonable suspicion exists that such individuals may be armed and dangerous, the officer may conduct a pat-down search as well. *Id*. The officers involved are likewise permitted to ask the detained individuals a moderate number of questions in order to determine their identity and to confirm or to dispel the officer's reasonable suspicion. *United States v. Butler*, 223 F.3d 368, 374 (6th Cir. 2000). The critical question for this portion of the *Terry* analysis is whether a reasonably prudent officer in the same circumstances would be warranted in believing that his or her safety or that of the public is in danger. *United States v. Campbell*, 486 F.3d 949, 955 (6th Cir. 2007). With these standards in mind, the Court turns to the facts as they existed at the time that Defendant Beverly was stopped outside the hotel on December 2, 2011.

In this instance, Det. Hodges possessed ample specific, articulable facts based on his direct observation, his training, the information provided by the informant, and his prior 18 years of experience as a narcotics officer to form an objectively reasonable belief that criminal activity was afoot that morning. Det. Hodges received timely information from a reliable informant that he had successfully worked with for approximately four years. He received the CI's information a mere two hours before the events that occurred outside the Springhill Suites that morning. The informant alerted Hodges to a suspicious FedEx package arriving from Sacramento, a known drug source city according to the detective. Hodges immediately went to the Kinko's where the package was being held for third-party pickup, a circumstance which in

itself suggested to Hodges the potential for drug-related criminal activity. When Hodges examined the outside of the package he saw numerous indicators of potential drug-related misconduct.

First, the package was hand addressed, as opposed to being typed. Hodges testified in his experience that legitimate businesses ordinarily prepare typewritten mailing labels. Second, the identification for the sender proved to be inaccurate. A quick, smart phone Google search revealed no D.I.S. company located at the sender's address on the package. In fact, the phone number for the sender apparently was not in operation. Third, Hodges noted that delivery of the package had been paid for in cash rather than by being billed to a company account. Fourth, the package, as noted, was mailed from a known drug source city.

Hodges immediately set up surveillance to determine who would be taking possession of the package. Defendant Beverly soon arrived at approximately 10:30 a.m. Beverly was driving an automobile with an out-of-state license plate, which Det. Hodges determined to be a rental vehicle. This circumstance also is potentially suggestive of drug-related activity as well. When Beverly departed the Kinko's office with the package in hand, he immediately began to drive in what can only be described as an evasive manner. Beverly crossed four eastbound lanes on W. Main Street without signaling. He turned south onto Third Street, then east onto Liberty Street, again without signaling at either turn. When Beverly finally reached his destination, the parking garage for the Springhill Suites on Jefferson Street, he entered going the wrong way into the parking garage through the one-way exit.

All of these circumstances, considered collectively, create an objectively reasonable inference that the FedEx package contained illegal narcotics or some other

contraband. It is clear to the Court that the detective was not acting upon a mere inarticulate "hunch" when he decided to approach Shomari Beverly in the breezeway of the hotel to ask him about the package that he was carrying.[6] Because an objectively reasonable suspicion existed at the time that Det. Hodges stopped Beverly that the package contained contraband, the Fourth Amendment was not violated by the warrantless stop that morning immediately outside the entry way to the hotel.

        A number of recent federal court decisions support this conclusion. *See United States v. Gill*, 280 F.3d 923, 928-29 (9th Cir. 2002) (postal inspectors had reasonable suspicion to seize a package based on the excessive wrapping of the package, the furtive movements of the mailer, the use of aliases as to the sender and addressee, and the fact that the sender resided at a different address than the return address on the package); *United States v. Taylor*, 956 F.2d 572, 578 (6th Cir.), *cert. denied*, 506 U.S. 952 (1992) (temporary investigative stop of suspect was objectively reasonable where officers knew that the defendant had arrived from a drug source city, had acted furtively as if conducting counter-surveillance, had paid cash for his airline passage, acted nervously, was sweating profusely, and was carrying two highly suspicious packages, but no luggage); *United States v. Clements*, Case No. 6:12-0046, 2012 WL 5386085 at *6-7 (W.D. La. Oct. 11, 2012) (police had reasonable suspicion to support an initial *Terry* stop of the defendant based on information that a FedEx package coming from California would

---

[6] The mere act of Det. Hodges approaching Beverly to ask him for his identification, as the government correctly points out, is not a seizure for the purposes of the Fourth Amendment. *See Florida v. Bostick,* 501 U.S. 429, 434-35 (1991); *United States v. Smith,* 594 F.3d 530, 535 (6th Cir. 2010). It is therefor debatable whether the Fourth Amendment is implicated at all at least in the initial phases of the encounter prior to the pat down. Nevertheless, the Court has analyzed the entire situation pursuant to *Terry*.

contain drugs, the package was observed to be picked up by black male who drove in an evasive manner failing to stop at stop signs and refusing to pull over for police before fleeing on foot).

Beverly in his post-hearing reply brief (DN 64) argues that the information provided by the CI, and the circumstances observed by Det. Hodges, on the morning of December 2, 2011 simply do not establish a reasonable suspicion under *Terry* to justify the investigative stop that occurred in the breezeway of the hotel. (DN 64, pp. 9-10). Beverly offers up a number of plausible innocent explanations for appearance of the FedEx package. For example, he suggests that possibly the package mailing label was handwritten and the package paid for in cash, rather than being a type-written label and billed to an existing business account, because the package was mailed by a small business rather than a larger commercial concern. Beverly reasons that to rely only on such innocuous indicators as a cash payment or a hand-written label would mean that thousands, perhaps tens of thousands, of entirely legitimate packages potentially would be subject to warrantless seizure and possible search by being inappropriately swept into the ambit of *Terry*.

Beverly makes a similar arguments with respect to Det Hodges mention of Sacramento, California as being a drug source city. Beverly maintains that this fact, as recognized by the Sixth Circuit in *United States v Urreta,* 520 F.3d 569, 576 (6th Cir. 2008), has little to no probative value. Given the current state of travel in the United States virtually any large metropolitan area potentially could be labeled a drug source city, or a city that suspected drug couriers may pass through when transporting illegal drugs. *Id.* (DN 64, p. 10). As for the Google smart phone search, Beverly argues only that the inability of Det. Hodges to identify the shipper D.I.S. or its address by such a search is hardly conclusive proof of its nonexistence.

13

Beverly then dismisses hiss multiple, driving violations observed by Det. Hodges as being only that– several misdemeanor traffic infractions and nothing more.

The common thread of all of these well-drafted arguments can be simply stated. Beverly maintains that each of the facts observed by Det. Hodges is indicative, at best, of only innocent conduct rather than criminal acts. The Court agrees that one can hypothesize an innocent explanation for each and every fact that the detective knew at the time of the *Terry* stop. The fact, however, that potentially innocent explanations can be offered up does not mean that a reasonable suspicion did not exist to stop Beverly in the breezeway. As the Court pointed out earlier, "a series of acts that independently may appear innocent, when taken together, can justify further investigation." *Arvizu*, 534 U.S. at 274; *United States v. Jones,* 562 F.3d 768, 776 (6th Cir. 2009)("[ C]ircumstances comprising a particularized and objective basis for reasonable suspicion need not be uncommon or especially unique. *McCauley*, 548 F.3d at 444. Further, although each particular act in a series of acts may be innocent in itself, taken together, they may substantiate suspicion of wrongdoing warranting further investigation."); *United States v. Jacob,* 377 F.3d 53, 577 (6th Cir. 2004)(same), *cert denied, Gallardo v. United States,* 543 U.S. 1171 (2005); *United States v. Harris,* 192 F.3d 580, 584 (6th Cir. 1999)(same). Accordingly, based on the above-cited authority, the Court rejects Beverly's arguments on this point.

The final *Terry* issue involves the reasonableness of Det. Hodges' intrusion upon Beverly during the course of the stop that started on the hotel breezeway. Det. Hodges immediately identified himself and stated his purpose, which was to investigate the suspicious package. The detective displayed his police badge and did not have his sidearm drawn. After the defendant denied having identification and refused to provide his name, the detective

requested and allegedly received permission from Beverly to conduct a pat-down search which revealed the California driver's license card located in Beverly's rear pants pocket.

This entire sequence of events took no more than three minutes according to the detective. He then immediately conducted an NCIC check on the driver's license, while his partner kept Beverly under observation in the hotel lobby where Beverly was seated near the check-in desk. The NCIC check took only several minutes before Det. Hodges learned that the California driver's license bearing Beverly's picture and the name "Curtis Wright" was a fake. Beverly was then immediately taken into custody and arrested in the lobby of the hotel. This entire 3-minute sequence of events was neither overly long nor overly intrusive, but rather was reasonable in all respects. Consequently, the *Terry* stop was justified both in its inception and its duration.

**Consent to Search.**

The final question to be determined is whether Beverly knowingly and voluntarily consented to the pat-down search. Hodges does not maintain that the pat-down occurred without Beverly's consent because of Hodges' objectively reasonable belief that Beverly was armed. Rather, Hodges testified that he asked Beverly if he could search him for weapons and identification. Beverly, according to Hodges, readily agreed to allow the pat-down, which resulted in the discovery of the faux California driver's license. Accordingly, the focus falls by necessity on the consent exception to the search warrant requirement.

Black letter law provides that consent must be proven by clear and positive testimony. *See United States v. Haynes*, 301 F.3d 669, 681-82. It must be unequivocal, specific,

intelligently given, and uncontaminated by any duress or coercion. *Id*. (citing *United States v. Tillman*, 963 F.2d 137, 143 (6th Cir. 1992)). Whether consent was given voluntarily, or was the result of duress or coercion, express or implied, is of necessity a question of fact that must be determined from the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). The absence of any use of coercion such as threats or use of force are factors that may properly be considered along with the Defendant's prior experience with the criminal justice system. *See United States v. Ivy*, 165 F.3d 397, 402 (6th Cir. 1998). Also, the Court may consider the age, intelligence and education of the Defendant and whether he or she understood his or her constitutional rights. *United States v. Jones*, 486 F.2d 358, 360 (6th Cir. 1988). Finally, the Court also should take into account the nature and length of the Defendant's detention, as well as any possible subtle forms of coercion that might have affected the Defendant's judgment. *United States v. Watson*, 423 U.S. 411, 424 (1976).

Consideration of the above factors leads the Magistrate Judge to conclude that Defendant Beverly voluntarily and knowingly chose to consent to Det. Hodges' pat-down search. Beverly was not coerced in any fashion to consent. Det. Hodges made no threats and employed no coercion, subtle or unsubtle, in an effort to compel Beverly's consent. Beverly, an adult, was not inexperienced in matters of law enforcement. As the record reflects, Beverly had a prior criminal conviction for driving under the influence and possession of a loaded firearm. His encounter with Det. Hodges occurred in a public breeze way in front of the hotel not some remote, closet-sized police interrogation room such as in *Florida v. Royer,* 460 U.S. 491, 502 (1983).

Beverly consented to the search within minutes of the initial encounter with Det.

Hodges. Nothing in the record suggests that Beverly's consent was hesitant, incomplete or conditional in any respect, nor do the circumstances of the consent remotely approach what occurred in *Royer*, which involved an ineffective consent obtained following a *Terry* stop that evolved into an unlawful, warrantless arrest.

In *Royer*, the defendant was stopped in an airport by police after he fit the profile of a drug courier. *Royer,* 460 U.S. at 493. The defendant had purchased a one-way airline ticket to New York City with cash using an assumed name and had checked two suitcases with tags bearing the same false name. *Id.* Upon being approached by narcotics officers in the public concourse near the airline boarding area, the defendant voluntarily produced his airline ticket in the name, "Holt," and also his driver's license, which bore his actual name, "Royer." *Id.* at 494. The two detectives involved kept both the ticket and license and asked Royer to accompany them to a private interrogation room located 40 feet away off the concourse in the steward's lounge. *Id.*

The room itself was described as a "large storage closet" that contained only a small desk and two chairs. Without Royer's consent the officers used his baggage claim check to obtain his luggage from the airline and brought it to the "police room," where they asked Royer if he would consent to a search. Without verbally responding, Royer simply used his key to the luggage to open one of the two suitcases. *Id.* at 495. When Royer did not know the combination for the locks on the second suitcase, the detectives asked for permission to force it open, which Royer gave. *Id.* Both of the suitcases contained marijuana. *Id.* Only then was Royer told that he was under arrest, some 15 minutes after he was initially stopped on the public concourse. *Id.*

17

Faced with these disparate facts, the U.S. Supreme Court concluded that the consent obtained by the officers was ineffective to permit them to open the two suitcases they had previously seized from the airlines using Royer's baggage claim check and ticket. *Royer*, 460 U.S. at 504-506. In the Court's view, the initial, lawful *Terry* stop that began on the public concourse became an unreasonable seizure made without probable cause to arrest when the officers removed Royer to the confines of the closet-like "police room" for private interrogation prior to seeking his consent to open the suitcases. *Id.* at 506-07.

We simply do not have such facts before us in Beverly's situation. Beverly was initially stopped in a public breezeway immediately outside the entrance to the hotel lobby. He was never relocated to a private police interrogation room hidden from public view before being asked for consent to a pat-down search. To this extent, the hotel breezeway in the present case is far more analogous to the public concourse in *Royer* than the police interrogation room.

It should also be noted that the Supreme Court in *Royer* had no difficulty in accepting the legality of the initial *Terry* stop on the concourse. Indeed, the Court even offered as a possible, lawful alternative that the officers could have simply asked Royer for permission to search his luggage while he was located on the concourse, without removing him to the private interrogation room. *Id.* at 505. This is exactly what happened here where Det. Hodges immediately asked Beverly for permission to pat him down as Beverly stood in the Breezeway. Also, this request was made within moments of the initial encounter, substantially less than 3 minutes, not 15 minutes later as what occurred in *Royer*.

Finally, the consent sought here was not permission to conduct a more intrusive, warrantless search of the contents of the FedEx package, which was simply placed on a baggage

18

cart near where Beverly stood before being opened later pursuant to a search warrant, but rather a momentary pat-down of Beverly's person for identification, which Beverly had refused to offer. Given these substantial disparities, it is hard for the Court to view *Royer* as strong support for the conclusion that Det. Hodges acted unreasonably in any fashion under *Terry*, or that his conduct somehow rendered Beverly's consent involuntary or otherwise ineffective. Here, Beverly was not arrested until *after* the NCIC check revealed his possession of the fake California driver's license. Consent for the pat-down search occurred *prior* to the arrest, not after an unlawful, warrantless detention as in *Royer*.

Accordingly, the Magistrate Judge concludes that Det. Hodges lawfully performed a pat-down search under the Fourth Amendment based on Beverly's voluntary and knowing consent. For all of the above reasons, the Magistrate Judge shall recommend that the motion to suppress be denied.

## RECOMMENDATION

The Magistrate Judge having made findings of fact and conclusions of law recommends that the motion of the Defendant to suppress be **DENIED**.

## **NOTICE**

Within fourteen (14) days after being served a copy of these proposed Findings and Recommendation, any party who wishes to object must file and serve written objections or further appeal is waived. *Thomas v. Arn*, 728 F.2d 813 (6th Cir. 1984), *aff'd.*, 474 U.S. 140 (1985). 28 U.S.C. § 636(b)(1)(c); Fed.R.Civ.P. 72(b). A party may respond to another party's objections within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b)(2).

Copies to Counsel of Record